DREW, Justice.
James Zipperer and Henry Bennett were insurance agents employed by Peninsular Life Insurance Company. They customarily worked as a team. One witness testified that the most common practice of such salesmen in that area was working in the evenings after the dinner hour.
On September 30, 1965, Zipperer visited a customer at the Porthole, a bar and grill located in Ormond Beach west of the truck route bypassing Ormond Beach, Holly Hill and Daytona Beach. The customer was not there but Zipperer made arrangements with the owners to see him the next night, October 1, some time after 8:00 p. m.
On the following evening Zipperer picked up Bennett in his car to visit the customer at the Porthole and other clients of the two salesmen.[1] After leaving the Bennett home they visited a customer at J. M. Fields Department Store, leaving there between 8:30 and 9:00 p. m. with the agreement that they would return either later that evening or the next day. Prior to leaving the client at Fields they told *474 him that they had more' customers to see in Bunnell (a town a little more than twenty miles north), and that therefore they would probably not see him again until the next day. About thirty minutes later the two salesmen arrived at the Porthole to discuss with the proprietor a sale of group and hospital insurance but, after some time, were told to come back the following morning for a further discussion. They left the bar between 9:30 and 10:00 p. m. There is no evidence as to exactly where the agents were headed but there is evidence in the record that they had a client they desired to visit by the name of Vaness a few miles north of the Porthole. In any event, the next time the car in which they were travelling was observed was about 10:45 p. m. headed south on U.S. #1 near the intersection of the truck route with said highway. U.S. #1 is a divided highway leading to Bunnell about sixteen miles north. There are no towns or built-up area between the intersection and Bunnell. There was testimony that the car was going at a high rate of speed when it passed the eyewitness, and that the road was wet from a recent rain. One mile south of the intersection the car skidded and overturned killing both salesmen and a sailor. The accident occurred at 10:45 p. m.
There can be no doubt that the salesmen were in the course of their employment when they were last seen at the Porthole bar. The decision here turns upon the question of whether the legal effect of the evidence requires the conclusion that sometime between the time they left the Porthole and the time of the accident they departed from their employment and were pursuing a purely personal mission unrelated thereto.
The Judge of Industrial Claims denied compensation, apparently on the theory that because there was no evidence establishing that the activities of the salesmen after they left the Porthole bar were in the course of their employment, he was therefore compelled to deny compensation. The concluding paragraphs of his Order with respect to this matter are as follows:
“The undersigned further finds that at about 10:45 P.M. on the same evening, the decedents were involved in an accident while traveling at an excessive rate of speed as they traveled south on U.S. 1; that the activities of the decedents from the time they left the Porthold [sic] until the time of the accident are unknown; that there are cut offs from U.S. 1 shortly south of the scene of the accident where, by turning west, the decedents could have returned by a direct route to the Porthole or, by turning east, they could have proceeded by a direct route to the home of Mr. Bennett.
“The accident occurred at about 10:45 P.M., as set forth above, an unusually late hour for a business call unless prearranged and there was no evidence of any such arrangements. The decedents were on U.S. 1 traveling at a high rate of speed with a sailor whose destination was unknown, as was the decedent’s. The undersigned finds that the speed which the decedents were traveling was in excess of 65 miles per hour, thus violating a safety rule which resulted in their deaths.
“Therefore, the undersigned is compelled to find that the decedents, James F. Zipperer and Henry Bennett, did not meet their deaths as the result of an accident arising out of and in the course and scope of their employment with the Peninsular Life Insurance Company on October 1, 1965. To find that they were en route to see some other client would be to indulge in conjectural speculation which is supported only by inferences.” [R — pp. 85-86]
The Full Commission affirmed the Order of the Deputy, one member dissenting.
We quote with approval the dissenting opinion of Commissioner Lightsey:
“I am constrained to dissent for the reason that I do not believe the judge of *475 industrial claims has properly applied the law to the circumstances of this case. To my mind this cause is governed by the basic ‘dual-purpose rule’ which was clearly and succinctly enunciated by Judge Cardozo in Marks’ Dependents v. Gray, 251 N.Y. 90, 167 N.E. 181 (1929), wherein the judge stated, in part:
‘ * * * If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own. * * * If, however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel is then personal, and personal the risk (emphasis supplied).’
“It is clear to me that the deceased employees started out upon their insurance rounds and to do so they had to travel. Therefore, the work of the employees during the night of October 1, 1965, is governed by the above quoted rule. I find nothing in the record that leads me to believe that the deceased employees had deviated from their employment. It is common knowledge that most insurance men make their rounds at night when they can talk to both husband and wife regarding insurance problems. Such activity is certainly to the benefit of the employer. To my mind when they left home and started out on their evening rounds they were doing the employer’s business and continued doing it until they returned home. The mere fact that they had picked up a hitchhiker did not operate so as to deny them workmen’s compensation benefits. The burden is on the employer to prove that the employee has deviated from his employment. This the employer and carrier failed to do. See Hinton v. Sandstron, Decision No. 2-1595, dated May 18, 1966.
“In Section 18, Volume I of Larson’s Workmen’s Compensation Law the rule as to dual-purpose trips is stated as follows :
‘§ 18.00 Injury during a trip which serves both a business and personal purpose is within the course of employment if the trip involves the performance of a service for the employer which would have caused the trip to be taken by someone even if it had not coincided with the personal journey. This principle applies to out-of-town trips, to trips to and from work, and to miscellaneous errands such as visits to bars or restaurants motivated in part by an intention to transact business there.’
“Furthermore, I think that it is immaterial whether or not the employees actually contacted certain clients. The record reflects that they did contact one or two and that the primary purpose of the deceased employees leaving their homes on the night of the fatal accident was for the furtherance of the employer’s business. Accordingly, they were covered from the time they left home until they returned. The fact that they engaged in other small activities is not relevant. I would reverse the Order and remand the cause to the judge of industrial claims with directions to enter an Order finding that the accident of the deceased employees is compensable under the ‘dual-purpose rule’ and accordingly award compensation benefits to the widows and minor children.”
Moreover, in our view the evidence as found and determined by the Judge of Industrial Claims, none of which is in dispute, is clearly sufficient to establish that at the time of the accident these men were in the course of their employment and that such death arose therefrom. As we pointed out many years ago in Sanford v. A. P. Clark Motors,[2] the burden is upon the claimant to show “a state of facts from which it may be reasonably inferred that the deceased *476 was engaged in the Master’s business when the accident took place.” They have met that burden.
The logical explanation to be inferred from the undisputed facts is that these men after they left the Porthole were either returning to their homes after an attempt to visit Vaness or from a trip to Bunnell (less than 20 miles to the north), and that somewhere along the route or in Bunnell they had picked up the sailor. Under all the evidence that is the most logical inference. It was approximately an hour and fifteen minutes from the time they were last seen at the Porthole until they met their death. This was ample time for a visit to the Vanesses or even to Bunnell. The fact that they were travelling south on U. S. 1 when killed seems to concern the Judge of Industrial Claims and the Full Commission. It would be far more logical to travel the short distance from either the Vaness residence or the Porthole to a divided highway and then return home than to follow the other routes through congested areas. Even if they were on a personal mission, as pointed out in the dissenting opinion which we have quoted with approval, they were covered under the Act by virtue of the universally accepted dual-purpose rule.
A case involving almost identical circumstances is American Airmotive Corp. v. Moore.[3] In that case there was no direct evidence showing what the employee was doing when he was killed in a high-speed crash in his automobile. In finding the claim compensable we said, inter alia:[4]
“Why the deceased did not stop at the gate and fill his automoble tank and why he acted as he did are questions that will never be conclusively answered. The answers were lost forever when the lips of Moore were sealed in death. One could speculate at length and there may be a thousand answers — one as good as another.”
The facts here require little speculation. While there is a short gap in time between admittedly employment-related activities and the accident, such gap becomes insignificant when the whole evening’s events are coupled with the unquestioned custom of working evenings until quite late. It is a fair, almost inescapable inference, that they were still pursuing the employer’s business when killed.
In his order as affirmed by the Full Commission, the Judge of Industrial Claims found (as set forth in his Order heretofore quoted) that at the time of death these claimants were violating a safety rule. This finding is based upon the evidence of an eyewitness. While it is not the province of this Court to substitute our judgment on conflicting facts, our close scrutiny of the testimony of the eyewitness convinces us that it does not meet the standard of competency and substantiality sufficient to require a reduction of benefits to these claimants. There is no conflict. It is merely a question of legal sufficiency to reach the conclusion here. It is wholly inconsistent in many respects, and the basis for the witness’ conclusion that these claimants were going in excess of eighty miles per hour is wholly unacceptable. He reached such conclusion from the sound of the motor as it passed him, even though his windows were closed. Moreover, he testified that the car had been tailgating him for approximately one-half mile before the accident and that he was traveling about fifty miles per hour. This testimony is simply legally insufficient to support the Deputy’s conclusion.
The Order of the Full Commission is quashed with directions to remand to the Judge of Industrial Claims to enter an appropriate award for death benefits under the Act.
It is so ordered.
ERVIN, C. J., and ADKINS and BOYD, JJ., concur.
ROBERTS, J., dissents.
*477 APPENDIX

. Appended to and made a part of this opinion is a map showing the locations of the various points and places pertinent to the disposition of the questions presented in these proceedings. Each pertinent point or location is properly identified.

. 45 So.2d 185 (Fla.1950).

. 62 So.2d 37 (Fla.1952).

. Id. at 38-39.